Mr. Justice Teotteb.
delivered the opinion of the court.
In considering this case, I have not deemed it necessary or proper to follow the counsel into the wide field of discussion upon which some of them have entered, nor to examine the elementary questions which have been raised and very ably argued. The doctrines which have been insisted on, as the foundation in part of the title of the appellants, have formed the topics of fruitful controversy with philosophers and jurists, and are not yet settled in the judgment of mankind. Perhaps they never will be, so far at least, as to command a universal assent. In view of these considerations, it is quite unimportant that this court should ex *357 press an opinion, and more especially so, since the question has been settled by the paramount authority of the legislative will; so that whether the title of the appellants as heirs at law of Isaac Ross their ancestor, to the property he possessed, be derived from the law of nature, or the positive constitutions of the society of which they are members, is quite immaterial to the present inquiry, since it is very evident they have the title by law, unless their right has been defeated by a valid and effectual disposition made by the deceased.
1 shall therefore proceed to consider the question presented by the record, whether the provisions in the last will and testament of Isaac Ross, for the disposition of the slaves claimed by appellants, are legal and valid, so as to defeat the title of the heirs.
The will directs the appellees, as the executors of the same, to transport to the coast of Africa, such of the slaves of the testator, as shall elect to go; there to be settled in Liberia and remain free. Is this trust raised in the will authorized by law, or is it repugnant to any provision of the laws of this country, so. that its execution may be rightfully restrained ? It is urged by the appellants, that it is a will for the emancipation of slaves, and as-such, is opposed to the law and established policy of this state. That there is a mode provided for the manumission of slaves in this country, and no other can be permitted: that slaves, in this state are property, and the subject of absolute dominion is an undeniable proposition, since they have been so constituted by direct legislative enactment. Hence it is equally evident that their owner may emancipate them or in any manner renounce his right upon the clear principle of having the power to dispose of his own property as he pleases. The ability to devise or bequeath all his property by last will and testament, is conferred, upon the owner in general terms by the law of this state. Rev. Code, page 32, sec. 14. It follows of necessity, therefore, that the trust raised in the will of Capt. Ross is legal, unless there is something in the character of slave property which excludes it from the control of this general dominion or power; and this I take to be the true and real ground of our inquiries. For unless the law has imposed modifications or limitations upon *358 the power of disposition in regard to slaves, which do not exist in relation to other property, the present controversy must be considered as at an end. Considerations of policy might well justify legislative regulations as to the method of emancipation, as that it shall be done by deed or will sanctioned by the legislative authority in consideration of meritorious services to the master or distinguished services to the state, and under proper guarantees that they shall not become a public charge. And accordingly the legislature have prescribed limitations in substance such as the foregoing upon the right of emancipation. The act of 1822, embodies these rules, and declares the policy of the state in relation to slaves, free negroes, and mulattoes.
If the will in this case provided for the manumission of the slaves in this state, it would then unquestionably bo opposed to the principles of this statute, and could not be enforced. And it would be inoperative for the same reason that a deed or any other instrument for the same purpose, executed by the testator, would have been so. It is not then because the intention to manumit is expressed in a last will and testament, that it must be defeated, but it is because the policy of the state, which is declared in the act of assembly, is opposed to such intention in any form. No one can by his mere act, unsanctioned by the public authority, set his slave free in this country, either by will or deed. And hence what he cannot do himself, cannot be done by trustees. That which he cannot do by his own act whilst living, cannot be done by his executors when he is dead. No man can delegate to another a power which he does not himself possess. Capt. Ross could not in his lifetime by any instrument or act grant freedom to his slaves, as a boon to be enjoyed in this state. That would frustrate the policy of the statute, which is opposed to an augmentation of free negroes in the state; a result hazardous to the safety of the owners of slaves, and the security of the public peace. This I take to be the full scope and design of the statute. It may well be urged therefore, as it has been in every the most forcible and ingenious form of argument, that the appellees cannot be suffered to execute the trust expressed in the will, assuming it to be a trust for the emancipation of slaves generally. Rut the question presented in the record, is not whether the testator had the ability to *359 manumit his slaves without the consent of the legislature, but whether he possessed the power to send them to Africa there to remain free. It is true that the freedom and happiness of his slaves appears to have been the object, an object he had power to pursue by any means not incompatible with the laws of this state. The act of transporting them to Africa, there to remain free, does not seem to be an act of manumission within the meaning of the statute, or its spirit or policy. No question has been made of the power of the testator to carry his slaves to Africa in his lifetime. Nor indeed was it possible to have raised such question without a manifest absurdity. The power to have done so, resulted to the testator as the owner of the slaves from his acknowledged right of absolute dominion. Having this power himself, it was certainly competent for him to employ another to do the same thing, or to direct it to be done by his executors, who are trustees to carry his intentions into effect. But it has been urged that the trust in the will was raised from a studious design to evade the restrictions upon emancipation which the policy of the state has imposed, and was a fraud upon the law. And this is really the substantial gravamen of the whole of the able and learned arguments which have been offered to defeat the execution of the will. But this general charge of fraud is assumed merely as an inference of law, from the character of the trust set forth in the will, not based upon any facts urged in its support. But this-general way of imputing fraud to a transaction which is fair and legal upon its face, without reference to any extrinsic or collateral act, is not sufficient to defeat it. Nor was it upon this ground that the cases were decided, which have been relied on by the appellees in support of their title.
The case of Hinds et al. v. Brazeale et al. rvhich was decided at a former term of this court, 2 Howard, 837, proceeded upon a state of facts very different from that developed in the pleadings in the case at bar. In that case, Elisha Brazeale, the testator, left his residence in Mississippi, and carried the slaves in controversy with him to Ohio, and there executed a deed of manumisa sion, when he returned with them to his home in this state. His will, subsequently made, directed their manumission according to the deed before executed in Ohio, and assuming them to be free *360 in virtue of the deed, devised all the property of the testator to them. The deed of emancipation was held void, because as a contract for freedom it was to be executed in Mississippi, whose laws and policy forbid it in the mode then attempted, and because the farcical excursion into Ohio by the testator, his immediate return into this state with the slaves to his former residence, and continuing there as a citizen up to the period of his death, with the other circumstances, demonstrated his intention to evade the laws of the state and commit a fraud upon their provisions. “ It is a settled and sound principle,” says the judge who delivered the opinion of the court, “ that no state will enforce a contract made by its citizens elsewhere in violation and fraud of its laws.” This is the general principle, and the rules of national comity are not to be enforced, or cease to be binding when the execution of the contract is forbidden by a great princijde of state policy. But how can the application of the doctrines of that case be invoked to restrain the execution of a trust for the bona fide transportation of slaves from Mississippi to Africa, there to remain free? That case went on the ground expressed by the court, that the deed of emancipation having been made in Ohio in pursuance of a scheme planned and executed to evade the rigor of the laws of this state, was to be treated as a deed made in this state and to be executed here, and therefore clearly void.
It will not be contended, however, that the testator had not a right to take the slaves to Ohio, and leave them there in the enjoyment of freedom, according to the constitution of that state. Placed thus beyond our limits, their freedom could not be the subject of animadversion by the municipal laws of Mississippi, whose rigorous police regulations on this subject, were designed for the security of slave owners in the state, against the dangers of too great air increase of free negroes, whose example and whose means too of sowing the seeds of mischief, of insubordination, perhaps of revolt, amongst the slaves in their neighborhood, was very justly to be apprehended and guarded. It is not the policy of Mississippi to augment her slave population. In her written constitution, she has spoken her will in unequivocal language, and the fiat there made of her future policy has been seconded by the sternest legislative sanctions.
*361 As the case of Hinds v. Brazeale decided the deed of emancipation to be void, on the ground that it was to be considered as a deed made in Mississippi, so the case so much rélied'on by J¡he appellant of Haywood v. Cravens’ executors, 2 North Carolina Law Rep. 557, decides the trust created by the will in 'that case to be void under the statute of North Carolina, where the trust was to be executed. The will gave certain slaves to the-executors, in trust, to have them emancipated and set free by the laws of that state., But by the laws of North Carolina the executors had no such power, and as it was a bequest of emancipation to take effect under the laws of the state, it was properly enough held to be void. And the other cases will be found upon examination to relate to bequests of a similar character, or to contracts whose execution are forbidden by the laws of the state. 1 have not been able to procure all the cases cited by the counsel 'for the appellants, but feel-satisfied from the principles established in those which have been examined, that, the views above presented are not shaken in any of them. And more especially, since they are so fully sustained by the cases of McCutchen v. Marshall. 8 Peters, 285; 2 Call. Rep. 319, 357; 8 Louis. Rep. 475; 11 do. 499; 14 do. 410; 6 Yerger, 119; 7 do. 552.
Being thus clearly of opinion that the trust,created by the will of the testator is valid, it is not considered necessary to examine the other questions which have been raised on the argument. The decree of the Chancellor must be affirmed, with costs to the appellees.
Since the opinion in this case was delivered, I have met with the case of Frazier et al. v. Frazier’s executors, which was decided by the Court of Appeals in South Carolina, as late as the year 1835, and reported in 2 Hill’s Chancery Reports, 305. The identical question which was raised under Mrs. Reed’s will, arose in that; was fully discussed at the bar; and received the most careful examination of the court; who held the trust to be a valid one, which the executors might be,compelled to execute.
The bequest in the wilj of John Frazier, which gave rise to the controversy between the heirs and the executors, was, that the slaves of the 'testator should be hired ofit during the lifetime of his widow, and that after her death, the whole of them should be set *362 free by his executors, &c. “ The interest of the money is to enable them with the assistance of government to go to St. Domingo to be colonized, or to any port that they with the government may choose.” Upon the death of the widow, the executors seized the negroes, with the view of carrying the will into effect. And a bill was then filed by the next of kin, claiming the ne-groes, &c.
The act of 1830, of that state, provides, “ that no slave shall be emancipated but by act of the legislature.” The court say, that although the provision is general, and might seem to prohibit emancipation out of as well as within the state by a citizen, yet such construction would be manifestly contrary to the spirit of the law. “ The evil was the increase of free negroes in the state by emancipation.” “ The removal of slaves belonging to citizens of the state, and their emancipation in parts beyond her territorial limits, was no injury to her.” «It will not be denied,” say the court, in continuation, “ that the owner might have removed his slaves from this state at any moment, and for any purpose he pleased.” And it is laid down as a general rule, to which there is no exception, unless by express statutory provision, “ that the owner of property may, by his will, direct his executors to dispose of it in any way which he could.” The importance of the case to the parties and to the country, the zeal with which the able counsel who argued it, resisted the conclusions of the court, as well as the agitation it has produced in the country, are the reasons which have induced me to adduce this superadded authority to support the judgment of the court.